**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | **Crim. Case No.:  SAG-17-0089** |
| | * | |
| SHANE RADER, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**MEMORANDUM OPINION AND ORDER**

On June 9, 2017, United States District Judge J. Frederick Motz sentenced Defendant Shane Rader to 60 months of incarceration, to be followed by a period of four (4) years of supervised release.  ECF 16.  Rader is currently incarcerated at the United States Penitentiary in Hazleton, West Virginia, and has a projected release date of October 12, 2021.  ECF 28 at 9; ECF 25-7 at 1.  On June 8, 2020, Rader, through counsel, filed an Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), and a separate Memorandum of Law under seal. ECF 23; ECF 25 (collectively, "the Motion").  The Government opposed, ECF 28, and Rader replied, ECF 30.  For the reasons that follow, Rader's Motion will be denied.[1]

I. **FACTUAL BACKGROUND**

The following facts are derived from Rader's plea agreement:

On or about March 4, 2016, the Defendant, Shane Rader agreed to sell another individual 3.5 grams of methamphetamine in Washington County, Maryland.  On March 4, 2016, Rader and the buyer met near the intersection of Route 615 and White Oak Ridge in Hancock, Maryland.  Rader handed the buyer a small ziplock bag containing methamphetamine in exchange for $500.

On or about May 17, 2016, a package addressed to Rader's residence was intercepted by the U.S. Postal Service and searched pursuant to a search warrant. The package contained approximately 35 grams of methamphetamine.  The U.S.

---

[1] This Memorandum Opinion and Order is an identical copy of that originally filed under seal on July 10, 2020.  ECF 31.  The parties have informed the Court that no redactions are necessary.

Postal Service removed 30 grams of methamphetamine and attempted to deliver the remaining 5 grams to Rader.  On May 19, 2016, Rader accepted the package, opened the package, and disposed of the contents.

On May 19, 2016, Rader's resident [sic] was searched, pursuant to a search warrant. The opened envelope that had been delivered minutes prior was located in Rader's bedroom.  Additionally, eleven firearms, including a loaded shotgun, rifles, and handguns and ammunition were recovered inside Rader's bedroom and basement living space.  Packaging materials, including zip lock bags and several digital scales were also recovered.

The methamphetamine recovered was more than 20 grams, was intended for repackaging and sale, and was pure (actual) methamphetamine.

ECF 6 at 8.

On February 15, 2017, the United States Attorney's Office filed a one-count information charging Rader with possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1).  ECF 1.  Pursuant to his written plea agreement, Rader pled guilty to the Information on March 15, 2017.  ECF 6, 11.  Rader agreed that, for purposes of the Sentencing Guidelines, his adjusted Offense Level was either 23 or 25 (depending on the application of a two-level increase for possession of a firearm).  ECF 6 at 4.  The parties agreed, pursuant to Rule 11(c)(1)(C), that a sentence of sixty (60) months imprisonment was the appropriate disposition of the case.  *Id.*  At Rader's sentencing on April 8, 2011, Judge Motz found that Rader had a criminal history category of III and a total offense level of 25, for an advisory guideline range of 70 to 87 months.  ECF 18 at 1.  Nevertheless, Judge Motz concurred with the parties' agreed disposition, and imposed a variant sentence of 60 months, representing the statutory mandatory minimum penalty, in addition to a four-year supervised release period.  ECF 17 at 2; *see* 21 U.S.C. § 841(b)(1)(B)(viii) (2012) (providing a five-year statutory mandatory minimum sentence for an offense involving more than 5 grams of pure methamphetamine).

After serving roughly thirty-five months of his sixty-month sentence, having incurred no infractions, and having availed himself of extensive programming at USP Hazleton, on March 26, 2020, Rader filed an administrative request for reduction in his sentence, based on a debilitated medical condition.  ECF 25-1 at 3-4.  His request was denied by the Warden, *id.* at 5, and Rader twice unsuccessfully pursued relief through the Administrative Remedy Process, *id.* at 6-12.  The instant Motion followed, in which Rader cites to "a number of health issues, including T3 incomplete paraplegic, asplenia, drop foot, and hypertension" as factors that make him more susceptible to experiencing a severe case of COVID-19, if he contracts the virus.  ECF 23 at 1.

## II.    LEGAL STANDARDS

As part of the First Step Act, enacted in December, 2018, Congress expanded 18 U.S.C. § 3582(c), permitting courts to reduce an existing term of imprisonment where "extraordinary and compelling reasons warrant such a reduction."  *See* 18 U.S.C. § 3582(c)(1)(A)(i) (2018); Pub. L. No. 115-391, tit. VI, § 603(b), 132 Stat. 5194, 5239-41 (2018).  While previously, any motion for compassionate release had to be initiated by the Bureau of Prisons ("BOP"), the First Step Act granted defendants the ability to move the Court for a reduction in their sentence for "extraordinary and compelling reasons."  § 603(b)(1).  Before a defendant's motion can be filed with the Court, one of two conditions must be satisfied:  (1) the defendant must have exhausted all administrative remedies to appeal the BOP's failure to bring a motion on his behalf, or (2) thirty days must have lapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier.  *Id.*  Once a motion is for compassionate release is properly filed, the Court follows a three-step inquiry: (1) determining whether "extraordinary and compelling reasons" render the inmate eligible for compassionate release; (2) considering whether the factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a sentence reduction; and (3) ensuring that the reduction is "consistent

with applicable policy statements issued by the Sentencing Commission."   18 U.S.C. §
3582(c)(1)(A)(i).

## III.   ANALYSIS

The Government concedes that Rader adequately exhausted his administrative remedies,
and is therefore entitled to file this Motion.  *See* ECF 28 at 3.  As explained below, however,
Rader's Motion nonetheless fails to establish a sufficiently "extraordinary and compelling
reason[]" for compassionate release.

Congress has charged the United States Sentencing Commission to "describe what should
be considered extraordinary and compelling reasons for sentence reduction" under §
3582(c)(1)(A). 28 U.S.C. § 994(t) (2018).  In response, the Commission defined "extraordinary
and compelling reasons" to exist where (A) the defendant is suffering from a terminal or serious
medical condition; (B) the defendant is over 65 years old, has failing health, and has served at least
ten years or 75 percent of his sentence, whichever is less; (C) the caregiver of the defendant's
minor child dies or becomes incapacitated, or the defendant's spouse or partner becomes
incapacitated and the defendant is the only available caregiver; or (D) "other reasons" as
determined by the BOP.  *See* U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1(A)–(D)
(U.S. SENTENCING COMM'N 2018) [hereinafter "U.S.S.G."].

As several courts in this District have recognized, "[t]he First Step Act is in tension with
the [Sentencing] Commission's Policy Statement," because the "catch-all" provision of § 1B1.13
cmt. n.1(D) only allows the BOP to determine what "other reasons" constitute "extraordinary and
compelling" ones for release.  *United States v. Gutman*, Crim. No. RDB-19-0069, 2020 WL
2467435, at *2 (D. Md. May 13,  2020); *see also, e.g.*, *Wise v. United States*, Crim. No. ELH-18-
72, 2020 WL 2614816, at *4-6 (D. Md. May 22, 2020) (describing how § 1B1.13 "is outdated in

light of the [First Step Act]," and collecting cases holding similarly); *United States v. Decator*, __ F. Supp. 3d __, Crim No. CCB-95-0202, 2020 WL 1676219, at *2 (D. Md. Apr. 6, 2020) ("The Policy Statement in § 1B1.13, however, is at least partially inconsistent with the First Step Act."), *appeal docketed*, No. 20-6877 (4th Cir. June 15, 2020).  For the reasons elucidated by these courts, and others across the country, this Court concurs that it "may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)."  *United States v. Redd*, __ F. Supp. 3d __, No. 1:97-cr-00006-AJT, 2020 WL 1248493, at *8 & n.18 (E.D. Va. Mar. 16, 2020); *see also United States v. Mel*, Crim. No. TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020); *United States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *14 (E.D.N.Y. Apr. 22, 2020) (collecting cases); *Decator*, 2020 WL 1676219, at *2; *United States v. Young*, No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[D]ependence on the BOP to determine the existence of an extraordinary and compelling reason . . . is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act.").  The Government's argument to the contrary, ECF 28 at 5-6, is accordingly rejected.

Relevant to this case, as the Government correctly recognizes, the COVID-19 pandemic can, in certain circumstances, give rise to an "extraordinary and compelling reason[]" for an inmate's release under the First Step Act.  *E.g.*, *Wise*, 2020 WL 2614816, at *6-8; *Gutman*, 2020 WL 2467435, at *2; *see* ECF 28 at 10-11 (the Government's concession).  In this Court's view, the case law demonstrates that continued exposure to COVID-19 in an incarcerative setting might convert a medical condition that might not otherwise be deemed "serious" into a "serious medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within

the environment of a correctional facility and from which he or she is not expected to recover." *See* U.S.S.G. § 1B1.13 cmt. n. 1(A)(ii)(I).

The fact that COVID-19 is present in a correctional facility is not alone sufficient to qualify an inmate for compassionate release under the First Step Act. *See United States v. Williams*, Crim. No. PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.) ("The existence of the present pandemic, without more, is not tantamount to a 'get out of jail free' card.").  Instead, to qualify for compassionate release, an inmate must demonstrate that he (1) has a condition that compellingly elevates his risk of becoming seriously ill, or dying, from COVID-19, and (2) is more likely to contract COVID-19 in his particular institution than if released. *See, e.g.*, *Wise*, 2020 WL 2614816, at *6-7 (discussing the danger that COVID-19 poses, and collecting cases finding that "serious chronic medical conditions and old age qualify" as compelling reasons for compassionate release); *United States v. Austin*, Case No. 15-20609, 2020 WL 2507622, at *4-5 (E.D. Mich. May 15, 2020) (finding that even if the defendant's petition was timely, release would be improper, even though he both was immunocompromised and had heart disease, because there were no COVID-19 cases at his prison), *appeal filed*, No. 20-1523 (6th Cir. June 8, 2020); *United States v. Harper*, Crim. No. 7:18-cr-00025, 2020 WL 2045381, at *3 & n.3 (W.D. Va. Apr. 28, 2020) (release justified by the defendant's age, heart condition, COPD, emphysema, and asthma, coupled with the fact that the prison he was housed at had "the fourth largest number of infections among federal prisons in the country"); *Mel*, 2020 WL 2041674, at *3; *United States v. Shah*, Case No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020) (denying release, in part, because there were no COVID -19 cases at the inmate's facility, and the prison was making efforts to protect inmates).

The analysis under the first prong of this two-part inquiry is heavily guided by the CDC's published risk factors for incurring a severe, life-threatening case of COVID-19. This Court previously adopted the CDC's nonexhaustive list of risk factors that it believed leaves individuals at a higher risk for severe illness, were they to contract COVID-19. *United States v. Lewin*, Crim. No. SAG-15-198, 2020 WL 3469516, at *3-4 (D. Md. June 19, 2020). On June 25, 2020, the CDC revised its guidelines, based on its analysis of newly obtained information. The CDC first examines the risk presented to a given individual based on their age. *People Who Are at Increased Risk for Severe Illness: Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (last updated June 25, 2020), https://tinyurl.com/r9fsgvx [hereinafter CDC Age-Based Risk Factors]. Generally, "[a]s you get older, your risk for severe illness from COVID-19 increases." *Id.* The age group at the highest risk, however, is those over the age of 65, as 8 out of 10 COVID-19 deaths reported in the United States are individuals in that group. *Id.* Rader is only thirty-nine years old. ECF 25-2 at 1. According to the CDC's most recent data, those ages 30 to 39 are hospitalized at a rate of 52.5 per 100,000 people. CDC Age-Based Risk Factors, *supra*. For those ages 40 to 49, the hospitalization rate only marginally increases to 84.6 per 100,000 people. *Id.* Accordingly, for the remainder of Rader's incarceration, his age places him at low risk for severe illness from COVID-19.

Next, the CDC discusses an individual's increased risk for severe illness from COVID-19 based on underlying medical conditions.[2] From here, the CDC distinguishes between those conditions which **do** create an increased risk of severe illness, and those which **might** create an increased risk. *People Who Are at Increased Risk for Severe Illness: People with Underlying*

---

[2] Of course, the added risk from underlying medical conditions is considered in tandem with individuals' risks based on their age.

*Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (last updated June 25, 2020), https://tinyurl.com/y9chuzkm [hereinafter "CDC Underlying Condition Risk Factors"]. Those who **are** at an increased risk for severe illness are those who have:

- Chronic kidney disease;
- COPD (chronic obstructive pulmonary disease);
- A compromised immune system resulting from a "solid organ transplant";
- Obesity, defined as a BMI over 30;
- "Serious heart conditions," including heart failure, coronary artery disease, or cardiomyopathies;
- Sickle cell disease; and
- Type 2 diabetes mellitus

*Id.* On the other hand, the following conditions **might** cause an increased risk for severe illness:

- Moderate to severe asthma
- Cerebrovascular disease
- Cystic fibrosis
- Hypertension
- A compromised immune system from causes other than a solid organ transplant;
- Neurologic conditions, "such as dementia";
- Liver disease
- Pregnancy
- Pulmonary fibrosis
- Smoking
- Thalassemia
- Type 1 diabetes mellitus

*Id.*

Applying the above two-pronged test, Rader fails to establish his entitlement for compassionate release. First, Rader has not demonstrated that his underlying medical conditions compellingly elevate his risk of becoming severely ill, or dying, from COVID-19. This Court credits the contention that Rader has several longstanding medical conditions, some stemming from a traumatic injury he suffered in 1998. At least two of the conditions he cites, "T3 incomplete paraplegic" and "drop foot," result in him requiring a crutch to ambulate, and suffering "lower extremity weakness and numbness, with a pronounced drop foot on his left side."

ECF 25 at 2.  Those conditions, while restrictive in terms of ambulation and mobility, have not been associated by the CDC with any increased risk of complications from COVID-19.

Rader also contends that his spleen was removed during surgery after the 1998 incident, and that its absence renders him "immune-compromised."  ECF 25 at 12.  He cites to no particular medical evidence to tie an increased risk of COVID-19 complications to asplenia. At most, if asplenia compromises Rader's immune system, he would have a compromised immune system from causes other than a solid organ transplant, which, according to the CDC guidelines, **might** increase his risk of complications from the virus.  *See* CDC Underlying Condition Risk Factors, *supra*.  Only a compromised immune system caused by a solid organ transplant is known, at this time, to increase one's risk of complications from COVID-19.  *Id.*  Thus, Rader's asplenia does not, by itself, compellingly elevate his risk of severe illness.

In addition, Rader cites his recently diagnosed hypertension as a significant risk factor. ECF 25 at 11-12. Once again, hypertension is in the category of conditions that **might** increase a patient's risk of severe complications from COVID-19.  Rader's records do appear to show elevated blood pressure readings, and a diagnosis of essential hypertension earlier this year. Rader's blood pressure was taken three times in 2019, and none of these readings exceeded 132/86. ECF 25-2 at 15.  But at a dental appointment on January 31, 2020, Rader displayed elevated blood pressure readings of 148/92 and 142/95.  ECF 25-3 at 22, 42.  The medical staff scheduled a follow-up appointment one week later, and Rader's blood pressure readings were 172/109 and 157/93. *Id.* at 21.  Over the next week, Rader began taking medication for hypertension, *id.* at 15 (showing two new prescribed medicines for hypertension) and enrolled in the facility's hypertension clinic, *id.* at 14.  On March 2, 2020, Rader's medication dosage was increased.  *Id.* at 6.  During a follow-up examination on March 6, 2020, Rader's hypertension was described as "Stable, no complaints,

no concerns, no chest pain, no shortness of breath, no [lower extremity] edema, no visual disturbances, no unusual/worsening headaches, reports compliance with medications, tolerating medications." *Id.* at 3.  His doctor thereafter ordered that Rader's blood pressure be taken monthly, for a full year.  *Id.* at 6.  His doctor also ordered an EKG test, *id.*, which was performed on March 28, 2020, and the results came back normal, *id.* at 61. Rader's most recent blood pressure reading, on May 12, 2020, was 122/78, which is below the levels constituting "hypertension" as defined by the American Heart Association.  *See id.* at 1; *The Facts About High Blood Pressure*, AM. HEART ASS'N, https://tinyurl.com/y6wuzw32 (last visited July 10, 2020) (defining Hypertension Stage 1 as having a systolic blood pressure of 130-139 or a diastolic reading of 80-89).  The medical provider noted, "hypertension controlled, inmate compliant with treatment, will monitor."  *See* ECF 25-3 at 1. While it is certainly possible that Rader could still experience more severe viral symptoms because of his medically controlled hypertension, the Court is not convinced that this increased risk is great.  *See* CDC Underlying Condition Risk Factors, *supra*.

Just because Rader has one or more underlying conditions that might elevate his risk for severe illness from COVID-19 does not mean that he is entitled to compassionate release.  Instead, his underlying medical conditions must compellingly increase his risk for severe illness, or death, if he were to contract the virus.  Considering the evidence outlined above, and Rader's young age, this Court cannot conclude that Rader's conditions so elevate his risk for severe illness should he contract COVID-19 that they constitute an extraordinary and compelling reason for compassionate release.[3]

---

[3] Rader has cited opinions from other judges of this Court, and other judges nationwide, making compassionate release decisions based on other inmates' medical conditions. *See* ECF 25 at 6-10. It is true that some other inmates that have been granted compassionate release also suffer from hypertension, among other conditions.  However, this Court does not find those decisions to be particularly persuasive, given (1) the uniquely fact-specific analysis required in this context,

Even if Rader's underlying medical conditions did compellingly elevate his risk for severe illness or death, Rader still fails to demonstrate that he is at a particularly elevated risk of contracting COVID-19 at USP Hazleton.  No inmates at that facility have contracted the virus. Two staff members have tested positive, but one is now recovered.[4]  Rader contends that other facilities have experienced fast-developing outbreaks, but provides no evidence, other than his own speculation, to suggest that USP Hazleton might experience a similar trend.  Given that COVID-19 is currently almost non-existent in USP Hazleton, and that Rader provides no evidence to support his otherwise unsubstantiated claim that the lack of confirmed cases at USP Hazelton is due to the Government's failure to test inmates confined there, Rader has failed to demonstrate that his current incarcerative setting creates a particularized risk of contracting COVID-19, sufficient to justify awarding him compassionate release.

Because Rader has failed to provide an extraordinary and compelling reason for compassionate release, the Court need not address whether a sentencing reduction would be consistent with the relevant Sentencing Commission policy statement and the relevant § 3553(a) sentencing factors.  The Court observes, however, that granting Rader the requested compassionate release would likely conflict with the policy goals of both Congress and the Sentencing Commission, given that Rader was sentenced to the minimum mandatory sentence permitted, which required a downward variance from the Advisory Guidelines range.  This Court also notes

---

including each inmate's age, medical history, and the conditions at the facility of incarceration; and (2) the CDC's constantly evolving understanding of how different underlying medical conditions impact one's experience with this novel virus.

[4] *COVID-19 Cases*, BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited July 10, 2020).

that one of the relevant § 3553(a) factors is that the sentence imposed protect the public from further crimes of the defendant.   18 U.S.C. § 3553(a)(2)(C).   Rader's proposed release plan involves his return to the same residence where he engaged in the receipt and packaging of a dangerous controlled substance, methamphetamine, for distribution, and possessed eleven firearms, "including a loaded shotgun, rifles, and handguns and ammunition."   *See* ECF 6 at 8; ECF 25 at 14-15.   This Court is not confident, then, that release to that residence for the remainder of the sentence of incarceration, even with the installation of electronic monitoring, would afford adequate protection to the public.

Ultimately, Rader is not entitled to the relief sought because he has not established a serious medical condition under the circumstances of the current pandemic, a rampant COVID-19 outbreak at his place of incarceration, or any other extraordinary and compelling reason that might support his early release.   Rader is essentially in the same position as all other incarcerated individuals, because they unfortunately are less able to engage in social distancing practices as a result of their confinement.   That fact alone, however, is insufficient to justify this Court's invocation of compassionate release.

## **ORDER**

For the reasons stated in the Memorandum Opinion above, it is, this 10th day of July, 2020, hereby **ORDERED** that Rader's Emergency Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), ECF 23, is **DENIED**.   The parties are **DIRECTED** to confer and, on or before **5:00 p.m. on July 17, 2020**, submit to the Court proposed redactions to the Memorandum Opinion so that the Court may file a public, redacted version.

_____/s/_____
Stephanie A. Gallagher
United States District Judge
